Smart Meter Awarene v. City of Naperville All right, our second case for this morning is Naperville Smart Meter Awareness v. City of Naperville. And Mr. Gobranson, we are ready for you. May it please the Court, this case is about the erosion of privacy in the home under the guise of technological progress, where the right of citizens to be secure in the private details, intimate details of their home is eroded and violated by a government-run, government-owned entity on a 15-minute increment. Whose idea was it to get this information from the home? In terms of deploying the smart meters? Yeah. The smart meter deployment is part of an overall government project and utility project to modernize the electrical grid. Related to climate change? Well, it's not necessarily related to climate change. It isn't? The utility data that's gathered from the smart meters? Right. Well, it's about increasing the efficiency of the electrical grid in terms of deployment of electricity, purchasing electricity on the open market, making that more affordable for the municipalities, for the utilities, and also allowing more efficient delivery and efficient use of electricity in the home. So I understand that these 15-minute increments allow the seller, in this case the city of Naperville, although this would be equally true if it were ComEd or somebody, to know precisely what times of day demand is greater, perhaps have pricing structures that smooth out the need for electricity and thus allow for better, more efficient use of the generating plants, or transfers from other parts of the grid. Correct. data on a 15-minute increment or an increment that's greater than the traditional once-a-month reading that you would have with an analog meter does allow for some increased efficiencies. However, there is both a quantitative and a qualitative difference in the information that's being gathered by the meter itself, and not all of that information that's being gathered is critical for the purposes of billing. So let me ask you this. Somehow or another, there needs to be monitoring of electric use over whatever the billing period is, let's call it a month. And to come up with even a monthly bill, the electric companies got to keep track of each kilowatt hour of electricity that the user has. And so somewhere in the depths of the computer, maybe not for an analog, but for any kind of digital device, you would have that information. My sense of your argument is that you're concerned more about the potential of misuse of this every 15-minute data than you are about anything that's actually happened. I mean, they say they're using it for the efficient use of the grid, billing, being able to encourage you to run your dryer at 11 o'clock at night instead of at 5 o'clock in the afternoon because of demand surges. So why are we here now? Don't you need some evidence to show or some allegation to show that the kinds of privacy abuses you're concerned about have actually happened? Well, the privacy abuse is the gathering of the data that reveals the intimate details of the home. But what if nobody ever looked? I feel like I'm asking you if a tree falls in the forest. Does anybody hear it? But there is the gathering. But I thought we agreed that the gathering, at least at the aggregate level, is fine. You know, you need it for billing. Nobody's here arguing they need free electricity in Naperville. So the gathering is going to happen. Well, the issue here, and this was a fundamental misunderstanding of the trial court, is what is meant by aggregate data for the purposes of billing. The trial court made the assumption that when the city talks about aggregate data that's gathered by smart meters, that it was the same type of aggregate data that was gathered by analog meters, just on an increased frequency. While it's true that the smart meters do gather the same kilowatt-hour usage that is gathered by a traditional analog meter, just on an increased frequency, the 15-minute interval, they also gather a number of other metrics related to the use of electricity in the house. Could you give me examples? Yeah, they monitor something called reactive power. What's that? Reactive power is the difference between what an appliance uses in its actual operating versus what it's drawing. My understanding from the data that's collected is that that data, the reactive power data, which includes voltage information, amperage information, and this was conceded by the city in the hearing that took place before the trial court, is that that information that is gathered can be used to identify unique signatures of appliances that are found in the home. It's that aggregate data, the additional data that's gathered by the smart meter, that can be used to determine whether or not someone is in fact washing their dishes in the home, or running the dryer, or running the washer, or using an electric water heater. Now, a lot of utilities, I don't know about Naperville, but ComEd, for example, has programs that if people own old, inefficient refrigerators, or dryers, or dishwashers, or whatever it is they own, ovens, they'll actually pay you to get rid of it and put in a better, more efficient device. And there's a school of thought in the electric generating business that conservation is really just as good as building a new generating plant, that what we really need to do is meet need, and if you can do it with fewer kilowatt hours, so much the better. So I guess what that leads me to wonder is why, again, Naperville doesn't actually have a business interest in collecting this data. Not just to be snoopy and figure out who's making a lot of apple pies, but you know. Well, they have a business interest in the efficiency of their grid, but that can be achieved. And the efficiency of the appliances that their customers are using. Well, the efficiency of the grid and the overall efficiency of the appliances being used can be determined from that overall kilowatt hour aggregate that would have been collected with an analog meter. The additional data from the smart meter is not necessary to make that specific determination. What if they used, maybe you would find this offensive, but I'd be interested to know, what if they used this kind of reactive data to conduct a targeted mailing to people with old clunky appliances, and say, you know, we are going to give you whatever, I'll make up a number, $300 to get rid of your old inefficient appliance. They don't want to bother everybody in the city with this, but they do a targeted mailing. Would you find that objectionable? Yes, because they're relying on data that indicates what's going on in the home. What type of appliance a person owns and how they're operating it. So you're saying the fact that it's a business reason doesn't really sway you? A business reason doesn't protect you from violation of the Fourth Amendment. Go ahead, say it's as pregnant as possible. I'm sorry? Go ahead, yeah, whatever else you want to say. Well, the trial court, in its analysis, the first error that the trial court made was finding that there was no reasonable expectation of privacy in the electrical use data that was gathered by the smart meters. I did have one other question about the analogs. Suppose, seems unlikely, but suppose a company that had not made the switch to digital yet decided that it was going to cost a lot of money to replace everybody's meter from the old analog to the digital. So instead they hire an army of underemployed people in their early 20s to go around and read the analog meters once every 15 minutes. They just circle around the neighborhood all day long and they jot down where it is. Legal? Yes, because there you're only collecting that raw usage data, the kilowatt hour data, that's the same as the analog meter. One of the things that the trial court pointed out was that in that instance the meter reader would be able to observe going on in the homes from the curtilage. I don't think so. I mean, I don't think you can tell from the curtilage of my house whether I've turned the oven on or not. Correct. But you would be able to see that on the analog. You could see certain externalities. If they had an air conditioner, for example, you could see the compressor was running. But you certainly couldn't reveal any details about what's going on within the home, such as the use of an oven, the use of an electric water heater, etc. So the trial court relied on the third-party doctrine to determine that there was no reasonable expectation of privacy within the data that's being gathered. However, the third-party doctrine as applied to this case is an app. The third-party doctrine protects data, well, protects a third-party and says that any data that is turned over to a third-party loses that expectation of privacy because it's been revealed to a third-party. There is no third-party here. Isn't it your big problem that the third-party doctrine is essentially absurd? I mean, you know, people turn information over their telephone companies, and as you know, we have the case pending in the Supreme Court about the Stored Communications Act. In the modern world, you turn all sorts of information over to companies because you actually want to be part of the modern world. You don't want to be off the grid. You don't want to live without a phone. You don't want to, in other ways, cut yourself off. And we call that voluntary. You know, it's kind of one of those things only a lawyer can love.  Correct. Yeah, there are issues. Why is yours any different? We enforce this third-party doctrine in all these other applications. Well, the key difference here is that the city of Naperville's DPUE is not actually a third-party. They're not an independent utility. They are 100 percent owned and operated by the city of Naperville. You know what bothers me about that, actually? If you were to win, it seems to me you would be giving a tremendous competitive boost to the private utilities. You would make it more expensive for municipally owned utilities, such as the one Naperville's chosen to have, to operate. And you would be actually inducing a switch over to the ComEds of the world. I don't know that that's true, Your Honor, because ComEd, for example, in their smart meter deployment program, offers customers the alternative of retaining an analog meter. It would be perfectly possible for, if the third-party doctrine did not apply to a municipally owned utility, Naperville would have the ability to offer an analog meter as an alternative, the same as ComEd. Now, they do have that alternative for the wired digital, right? Correct. You pay a little extra. The wireless alternative that's offered by the city of Naperville is simply a smart meter that has the radio disabled. So it's still logging the same information. It's still gathering all of the original kilowatt usage hour and the reactive data. It's just storing it on a memory card that then has to be picked up by the city once a month or some other interval. But the same data is there, as would be gathered on the 15-minute increment. Okay, well, maybe you would like to save a little bit for rebuttal, unless you have something more to say. Well, I just wanted to also say that the city relies, or has argued, about proprietary capacity in their brief. And it seems to be using that as a way to try to apply the third-party doctrine to them, as if they're working in a proprietary capacity, they should be treated the same way that a third-party utility would be treated. But as the Seventh Circuit noted in Wisconsin interglastic, the proprietary capacity does not absolve them from scrutiny under constitutional provisions. Okay. Thank you. Ms. Foley. Good morning. May it please the Court. My name is Kristen Foley, and I represent the city of Naperville. The city of Naperville, as the proprietor of an electric utility providing electric service to 57,000 customers, did not and does not violate the Fourth Amendment when it collects kilowatt-hour data usage every 15 minutes through smart meters, because the electric customers have voluntarily contracted for service with the city and have no reasonable expectation of privacy. But they have no other way to get electricity, right, if you happen to live in Naperville? Correct. Unless, I guess, they put solar panels on their house or something. Correct. They don't. And that argument of whether or not it is truly voluntary was addressed in the same manner in the Supreme Court cases of Miller and Smith v. Maryland involving banks and telephone companies, where the dissent said you can't function in modern society without having a bank account or cell phone. But lots of people can choose what bank you want, though. Correct, but as far as that theory was rejected by the majority, has been rejected by the majority since the 1970s. But I'm going to say that Miller is actually quite different. First of all, empirically, although the court didn't get into this, vast numbers of people function without bank accounts. That's why all those currency exchanges are sitting around downtown Chicago. There are many people who simply don't have either the real economic wherewithal or the perceived economic wherewithal to use the banking system. And so they live in the cash economy. They live in the currency exchange economy. So it's actually quite possible to function without a bank. It may be a little expensive if you need to cash a check, but it's possible. Secondly, electricity, I guess, is something that I have a very hard time, unless you're suggesting that people can go off grid altogether, as I say, and plaster solar panels all over the top of their house and live with that. But I don't think the Supreme Court has closed the door on something like electricity. It would be like saying, oh, you know, we'll put a smart water meter in, and sure, you can live without water. Well, not really. One of the interesting points as far as whether it's voluntary or not was addressed by the Fourth Circuit in U.S. v. Graham in one of the cell site location information cases. And there the Fourth Circuit analogized voluntary versus involuntary as being, are you aware as a customer that this information is being collected versus are you not aware of it that the police are taking it? So would you say that your obligation to pay a parking ticket is voluntary because you're aware that the city has decided that you parked in front of a fire hydrant? I think, well. Awareness is surely not enough to make it voluntary. The city would probably beg to differ. I think that's one component that this court consider in the grand scheme of whether it is voluntary or not. We have been providing electricity to our residents since 1907. Everyone is certainly aware that there is a meter on their house. Everyone is aware that they get monthly bills from the city, that electricity is not free, and that they're aware that we are taking incremental readings of their electricity usage. But you're not talking about what I'm going to just call the metadata, the additional data that Mr. Gulbranson said has been added to that collection of information since you left the analog platform. We are gathering and analyzing kilowatt hour data for billing purposes. That is it. We are not doing anything other than taking electric readings for the purpose of generating a bill and for the purpose of implementing future programs. One of the programs we desire to implement is a demand response program, which allows customers to turn down their electric usage during high peak hours and get a credit on their bill for that. So do we have a question of fact here then? Because he's very adamant that you're collecting more than that. And you're saying, no, we aren't. So don't we need to know? No, Your Honor. Either way, there is no judge Lee correctly decided that under the third-party doctrine, which is still valid law even though the Supreme Court is currently hearing the U.S. v. Carpenter case, the third-party doctrine is still valid. It has been held that there is no reasonable expectation of privacy in both the Eighth Circuit in U.S. v. McIntyre and the Sixth Circuit in 2016 in the case of U.S. v. Thomas. There's also been several district court cases in Oregon and Wyoming which say that there's no reasonable expectation of privacy in electric usage data. So when your electric company is reading your meter – Yeah, but do you give that information to anybody else to let them analyze it? No, absolutely not. In fact, what we did is we held – So you just keep it all to yourself. You don't give anybody else it. Correct. There are very few people who can have the information, and we specifically codified that in our ordinance. The people who can get the information are the electric department, the finance department for billing purposes, and the legal department. Those are the only people who can get the combination of customer and usage data combined. That's it. So we held ourselves to a higher standard. We have even said – we've even codified that we will not release any information without a warrant or a court order that has both the customer information and the amount of energy used. So we have a very high standard to prevent that from being used. And you recognize there would be a problem if you did that? If we revealed it to – If you didn't have what you say you – Well, I think that under the – you know, there is the case of Ferguson v. Charleston where if there is a completely commingled purpose between the city and the police department and you're not collecting energy or energy readings for billing, but you're really secretly collecting energy in cahoots with the police for something, then that's – So you could raise marijuana, for instance. Pardon me? So you could raise marijuana, for instance. Correct. Right. But we're not doing that here, and there hasn't been any facts that were ever pled by the plaintiff that way. I'm sure that Naperville has no marijuana problem, but go ahead. It'll all be legal soon. You won't have to worry about that part. What the plaintiff has worried about is the potential for abuse, is that at some point we are going to be able to glean way more information based upon the electric usage records that we are getting. I think the plaintiff has also said that you're actually already, if you will, collecting that information and storing it even if you've decided to put blinders on and not read it right now, and that the collection itself is the Fourth Amendment violation. I'm just – that's my understanding of his theory. Right. But it's not a – we are collecting it. We do hold it for three years, and then we purge. Where did three years come from? Is there some statute of limitation on bill collection? No, I think that before we didn't have a limit, and so then we enacted a specific limit so that there wasn't a massive data pile in some room that held it. You're running out of room. Go ahead. Pardon me? You're running out of room to store the data. Yes, yes. So we want to make sure we're storing just a very limited amount. So basically our theory as presented in the brief is that Judge Lee was right in that there's no right to privacy in electric usage data, but also even if there was a right to privacy in kilowatt hours, right to privacy in any sort of metadata, anything else, even if this court were to assume that there was some right to privacy in what we are taking, we're still not violating that right because what we're doing, we are operating an electric utility in a proprietary capacity. We have reasonable security measures to prevent that information from being disclosed to third parties. And third parties, you said, even means the police. Absolutely. So if the police are investigating Joe Smith's house for suspicious electrical use, there's got to be a warrant before you turn that over. Absolutely. So what we're doing is reasonable in scope. We have security measures, and we're also doing exactly what our private counterparts are doing, such as ComEd. ComEd is installing 4 million meters. But your opponent said, and I gather this is true in other places around the country too, that ComEd has left the option on the table for someone to have the old analog meter, and surely not that many people even want the thing. I mean, it seems to me that there are financial disincentives because it's more expensive to send somebody around and read analog meters. So the question, as I see it, is why isn't the option of an analog meter something that's required? Well, it's not required because we are allowed in our proprietary capacity to make reasonable business decisions. The Supreme Court, in the case of Whelan v. New York and NASA v. Nelson, said the test isn't for you to show what's necessary, or the test isn't for you to show that you're doing the least restrictive type of gathering of information. The test is what we are doing reasonable. And I assert to you what we are doing is reasonable. We have offered a non-wireless smart meter option. We don't want to go back to the analogs because, frankly, we can't take the 15-minute readings on an analog meter without an extreme amount of expense. We want everyone to be on the same type of meter. We feel that it's very important for our electric grid and our transmission going forward. So Naperville obviously purchases its electricity from somebody else out there on the general grid. Yes. So your argument is you're trying to keep the purchase costs down by mismanagement. Absolutely. And if we can keep our purchase costs down, we can then pass that along to our customers. We are a completely rate-based utility. We operate at no profit at all. So it's very important for us to be fiscally responsible to our taxpayers to make sure our rates stay as low as possible. You know, analog meters have been around for 60 years. We want the smart meters to be around for another 60. We want to have conservation abilities going forward. It is incredibly important to allow people to play a more active role in their energy usage. And if they want to turn down the dial on a hot summer afternoon to get a credit or to get some money off their bill, then we think that's a wonderful thing, and we want to allow our customers the ability to do that. What if they don't want to do that? They don't have to do that. They don't do that. It's completely voluntary. That's a program that's a demand response program that we are looking forward to implement soon. We haven't done it now, but it's completely voluntary. How do you push them to do it? Well, hopefully the lure of a reduced bill is enough incentive for most people to want to. That's it, though, just a reduced bill. Right. And conserving energy and going green. Most people want to have smart appliances. Most people you're seeing switching to having more control over their appliances, their programmable thermostats that you can operate by your phone and things like that. See, this is this Internet of things. It's starting to give some people the creeps, though. They feel like you're going to go into your house, and your oven is going to start talking to you about you've been using too much electricity. Right. Cut it out, and besides, you need to lose weight. You know what I mean? Well, I certainly understand that this was a change going from reading once a month to reading every 15 minutes, but we have a solid business purpose behind it. We are not alone. There are over 70 million smart meters that have been installed across the United States. What's the denominator? If we were all smart meter, how many of them would be out there? I believe that there would be around, I think that the 70 million is almost 50% right now. So we were kind of early. We did it several years ago. I think ComEd right now is still in the process. I think they're supposed to be done at the end of this year with their 4 million. It's important to remember what ComEd is doing, because also in the Wisconsin Interscholastic Athletic Association case, this court said that the tendency is to allow state actors performing commercial or proprietary actions the same latitude as their private counterparts. But you would agree, surely, with what Mr. Goldbranson said, that you may be trying to do that, but on the other hand, the Naperville electric utility is bound by the First Amendment. It's bound by the Fourth Amendment. You don't just say, well, we've decided to opt out of the Constitution. 100%. We 100% agree with you, and there has been no violation of the Fourth Amendment under either theory, under the third-party doctrine, or we're operating in a proprietary capacity because what we're doing is reasonable, because we have security measures and because our private counterparts are doing it. It's reasonable as well. So we're still complying with that. We're not violating anyone's Fourth Amendment rights or their right to privacy in taking the 15-minute increment readings of kilowatt hours. Okay. Thank you. Well, thank you very much then. Mr. Goldbranson. One thing that I wanted to point out, Your Honor, was when discussing the Naperville statute, the Naperville statute, which retains only three years of data, was actually enacted after the appeal was filed. And so I think that that's almost a tacit admission that there's a privacy implication here or at least a potential privacy problem. But you had mentioned specifically, Judge Wood, that does it require a warrant, and the Naperville statute does not require a warrant. It requires a warrant or a court order. And I think that language is significant because in McIntyre, one of the issues is that there was no warrant. The court order was, in fact, a subpoena that was issued by a prosecutor, so there was no judicial review, which is one of the major issues that we take with the city of Naperville's statute and their statutory provisions that are enacted to supposedly protect the privacy of the individual. There is no requirement for judicial review. There is no warrant requirement. There's nothing that would stop a Naperville prosecutor from issuing a subpoena for that information to the city of Naperville itself and having that data be turned over to the police department. But if there are proceedings to quash a subpoena, I mean, just because you get a subpoena doesn't mean everything happens. You can go back to the court and say this is excessive in scope, it's too burdensome, it's not relevant, you know, one can challenge a subpoena. Well, but who would be challenging the subpoena here? The city of Naperville, the utility is the city of Naperville, and the police department is the city of Naperville. So I don't know why the city of Naperville would challenge its own subpoena, the utility would challenge the subpoena issued by its prosecutor. What about this case? Suppose the city, I bet Naperville probably has fire regulations that restrict the number of people who can live in houses of various sizes, most places do. But suppose it notices that a house has, that ostensibly has two people living in it, has extraordinarily high electric usage, and it suspects that actually a huge number of people are living there, you know, 10, 15 people are all crammed in there. So that might be municipal ordinance enforcement that's outside the criminal realm, but there might be a discovery request or some other form of court order. Why is it that a court order is automatically not good enough? Well, because I think that we're talking about a Fourth Amendment violation, about the privacy interest within the home, and under the Fourth Amendment that requires a warrant with probable cause. The Fourth Amendment requires searches and seizures to be reasonable, and one way of showing that it's reasonable is that there's a warrant. There's not always a warrant requirement. Well, if there were exigent circumstances, for example, there may be an exception. Okay. All right. I see my time has expired. All right. Well, thank you very much. Thanks to both counsel. We'll take the case under advisement.